**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**RODNEY M. LANE,**

       Plaintiffs,

v.

**TED PHILBIN, *et al.*,**

       Defendants.

Civil Action No. 7:13-CV-36 (HL)

**ORDER**

Plaintiff Rodney Lane seeks redress for injuries he sustained as a result of the deliberate indifference of various officials at Valdosta State Prison. This Court previously dismissed Mr. Lane's *pro se* complaint for failure to state a viable Eighth Amendment claim of deliberate indifference, finding that Mr. Lane failed to allege that prison officials possessed the requisite subjective knowledge of the risk of serious harm faced by Mr. Lane. Mr. Lane appealed, and the Eleventh Circuit reversed the dismissal and remanded the case to this Court with instructions to permit Mr. Lane the opportunity to amend his complaint. Mr. Lane thereafter filed an amended complaint with the assistance of counsel. Now before the Court is Defendants' Motion to Dismiss (Doc. 69) Mr. Lane's Third Amended Complaint (Doc. 68) because Mr. Lane (1) failed to exhaust his administrative remedies; (2) failed to state a claim for deliberate indifference; and (3) because Defendants are entitled to qualified immunity. Following a review of

the amended complaint, and with the benefit of oral argument, Defendants'
motion is **DENIED**.

## I.  BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff Rodney Lane is a prisoner in the custody of the Georgia
Department of Corrections. (Doc. 68, ¶ 5). At the time the events underlying this
lawsuit transpired, Mr. Lane was housed at Valdosta State Prison ("VSP"). Upon
arriving at VSP, Mr. Lane was assigned to the Annex Building, a lower security
facility separated from the main prison. (Id. at ¶ 25). Mr. Lane was transferred
from the Annex to E-Building in March 2012. (Id. at ¶ 27).

E-Building is comprised of two dormitories, E-1 and E-2. (Id. at ¶ 17). Each
dorm houses approximately 50 inmates. (Id.). E-Building is widely referred to by
inmates and VSP staff alike as "gangland" because the majority of the inmates
residing in E-Building are known gang members. (Id. at ¶¶ 19-20). Mr. Lane was
one of six inmates in E-Building with no gang affiliation. (Id. at ¶¶ 20-21).
Unaffiliated gang members in E-Building have no protection, leaving them
vulnerable to inmate-on-inmate violence and theft of personal property. (Id. at ¶¶
22-23).

Inmate-on-inmate violence occurs at least every other week in E-Building.
(Id. at ¶ 32). Weapon possession among the residents of E-Building is

---

[1] The facts are taken from the complaint and are accepted as true for purposes of
the motion.

widespread and both known and encouraged by prison officials. (Id. at ¶¶ 35-37). Inmates procure weapons in various ways, including bringing back lightning rods and scrap metal found while working maintenance detail; removing light fixtures within their cells; removing parts from locker boxes in their cells. (Id. at ¶¶ 38-40). The inmates fashion these items into shanks. (Id.). Despite monthly "shakedowns" by prison officials, and despite prison officials having the authority to confiscate weapons and contraband, prison officials fail to do so. (Id. at ¶¶ 36-37, 42-45). Mr. Lane specifically alleges that Captain Sherman Maine routinely does not confiscate weapons during searches and, when he does remove weapons, he redistributes them to select inmates. (Id. at ¶¶ 43-46). Captain Maine also regularly cooperates with gang members, smuggling tobacco products and cell phones into the prison to assuage gang members who threaten violence in E-Building. (Id. at ¶¶ 49-50).

While the level of gang violence in E-Building is well known to prison officials, who regularly threaten unruly inmates with transfer to E-Building, VSP officials permit the dormitories to remain understaffed. (Id. at ¶¶ 51-54). E-Building is supposed to be staffed by a minimum of three guards: one guard in the control booth; one floor guard to supervise E-1; and one floor guard to supervise E-2. (Id. at ¶ 67). The role of the guard in the control booth is strictly to control ingress and egress from E-Building. (Id. at ¶ 68). He is not to leave the control booth under any circumstances. (Id.). From March 2012 through June 17,

2012, all 100 inmates in E-1 and E-2 were supervised by a single floor guard. (Id. at ¶ 69). VSP officials were aware that E-Building was understaffed at that time. (Id. at ¶¶ 70-75).

The outdoor sidewalk, commonly referred to as the "flat top," connects E-Building to the dining hall and has no guard staffing it, even as inmates traverse the walkway from the dormitory to the dining hall. (Id. at ¶¶ 76-77). As a result, attacks among E-Building inmates on the flat top are prevalent. (Id. at ¶ 81). When visibility is low, such as when there is fog, VSP staff will not dismiss E-Building residents to the dining hall. (Id.). Similar restrictions are not imposed on the other dormitories. (Id. at ¶ 82).

On the morning of June 17, 2012, while walking from E-Building to the dining hall for breakfast, Mr. Lane was attacked from behind by at least four other E-Building inmates with known gang affiliations. (Id. at ¶¶ 85, 97, 90-93). One of Mr. Lane's assailants struck him in the eye with a lock. (Id. at ¶ 94). Another attacker stabbed him four times in the back with a shank. (Id. at ¶ 95). The attack left Mr. Lane unconscious. (Id. at ¶ 96). Because no guard was on duty on the flat top, it took up to two minutes for a guard to reach Mr. Lane. (Id. at ¶¶ 86, 97). Mr. Lane was transported to the medical unit, where he received 18 staples to close the stab wounds in his back and skin glue to address the laceration on his eye. (Id. at ¶¶ 98-100). Upon release from the medical unit, Mr. Lane was placed in "the hole" for his own safety. (Id. at ¶ 102). After a month in the hole, Mr. Lane

was transferred to B-Building. (Id. at ¶ 104). However, once Mr. Lane filed a grievance based on the attack, he was transferred back to E-Building. (Id. at ¶ 105). This type of retaliatory conduct by VSP staff is a common method of controlling inmate behavior. (Id. at ¶ 106).

Prior to the June 17, 2012 attack, Mr. Lane requested that he be transferred to another housing unit on at least two occasions. (Id. at ¶ 55). He informed Counselor Shunda Woods about the violence in E-Building and told her that he was being threatened by other inmates. (Id.). Ms. Woods told Mr. Lane that she had no authority to transfer inmates and took no further action. (Id. at ¶¶ 56-59). Mr. Lane also addressed his safety concerns and transfer request with Sergeant Riley, who told Mr. Lane, "Everybody is trying to get out of E-Building." (Id. at ¶ 60). Mr. Lane additionally spoke with Deputy Warden Ted Philbin about the conditions in E-Building and the risk posed to his safety. (Id. at ¶ 61). Deputy Warden Philbin told Mr. Lane to sue him, that he had been sued before, and walked off with no further response to Mr. Lane's concerns. (Id. at ¶¶ 62-66).

Mr. Lane filed an informal grievance pertaining to the June 17, 2012 attack on June 19, 2012, alleging that prison officials violated his constitutional rights by failing to house him in a safe environment, and that this violation resulted in the attack. (Doc. 69-6, p. 15). He requested an internal investigation and a transfer out of E-Building. (Id.). Captain Maine denied Mr. Lane's informal grievance, remarking only that the "dorms are regularly searched for safety issues." (Id.).

Mr. Lane submitted a formal grievance on a form provided by prison officials on July 2, 2012. (Id. at p. 5). On the form and also in the attachment he provided prison officials, Mr. Lane again complained that VSP officials had failed to protect his constitutional rights. (Id. at pp. 4-5). He described his attack and indicated that prior to the assault he requested a transfer to another dormitory from Counselor Shunda Woods and Deputy Warden Ted Philbin for safety reasons. (Id.). He also asserted that Captain Maine failed to investigate gang membership. (Id. at p. 5).

Finding that appropriate action had been taken in response to the attack, VSP officials denied Mr. Lane's formal grievance. (Id.). He appealed. (Id. at p. 3). However, Mr. Lane's appeal was also denied because "[t]here [was] insufficient evidence to substantiate [his] allegation." (Id. at p. 2).

After the denial of his formal grievance appeal, Mr. Lane filed a *pro se* civil rights complaint pursuant to 42 U.S.C. ¶ 1983, alleging deliberate indifference by Counselor Woods and Deputy Warden Philbin to the serious risk of physical harm he faced. (Doc. 1). He later amended his complaint to include claims against Captain Maine and Deputy Warden Orr. (Doc. 8). Defendants moved to dismiss the complaint (Doc. 19), arguing that the claims against Captain Maine and Deputy Warden Orr should be dismissed for failure to exhaust administrative remedies, and that all of Mr. Lane's claims should be dismissed for failure to state a claim. United States Magistrate Judge Thomas Q. Langstaff issued a

Recommendation (Doc. 39) on February 4, 2014, recommending that Mr. Lane's complaint be dismissed for failure to state an Eighth Amendment claim for deliberate indifference. This Court adopted the Recommendation and dismissed the complaint. (Doc. 41).

Mr. Lane appealed the dismissal of his complaint to the Eleventh Circuit. Following oral argument, the Eleventh Circuit reversed the decision of this Court, holding that Mr. Lane's complaint alleged sufficient facts in support of his Eighth Amendment deliberate indifference claim to make it plausible that Defendants had knowledge of the substantial risk of serious harm he faced. The appellate court remanded the case with instructions to permit Mr. Lane to file a third amended complaint, which Mr. Lane did with the assistance of counsel.[2] Defendants now move the Court to dismiss Mr. Lane's third amended complaint, arguing again that Mr. Lane (1) failed to exhaust his administrative remedies; (2) has not sufficiently pled the elements of an Eighth Amendment deliberate indifference claim; and (3) that Defendants are entitled to qualified immunity.

---

[2] The Eleventh Circuit appointed counsel to represent Mr. Lane on appeal. In the order remanding the case, the Court further suggested that this case may warrant appointment of counsel in the trial court. Any appointment of counsel is unnecessary for this Court to consider, however, because the same attorneys appointed to represent Mr. Lane on appeal have entered their appearance as pro bono counsel for Mr. Lane.

## II.   DISCUSSION

### A.   Motion to Dismiss Standard

When reviewing a motion to dismiss, the court shall accept "all well-pleaded facts . . . as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271,1273 n. 1 (11th Cir. 1999). The court must dismiss the complaint if, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (citing Executive 100, Inc. v. Martin County, 992 F.2d 1536, 1539 (11th Cir. 1991) and Bell v. Hood, 327 U.S. 678, 682 (1946)). Accordingly, to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

### B.   Exhaustion

The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust all available administrative remedies before filing federal claims. 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534

U.S. 516, 532 (2002). When a prisoner fails to complete the administrative process or falls short of the procedural requirements, he procedurally defaults his claims. Johnson v. Meadows, 418 F.3d 1152, 1159 (11th Cir. 2005).

Defendants here do not argue that Mr. Lane did not properly follow the Georgia Department's three-step grievance procedure. Rather, Defendants argue that Mr. Lane's grievance was substantively deficient and, therefore, procedurally defaulted as to Defendant Calvin Orr because nowhere in his grievance does Mr. Lane mention or describe any conduct by Orr. Defendants also move the Court to dismiss Mr. Lane's claims against all of the remaining Defendants on the premise that in neither his formal nor his informal grievance did Mr. Lane satisfactorily describe any deliberate indifference or wrongdoing by any Defendant.

### 1. Claims against Deputy Warden Calvin Orr

Defendants contend that Mr. Lane failed to exhaust his administrative remedies against Defendant Deputy Warden Orr because Mr. Lane did not mention or otherwise describe Orr in any fashion in his grievances; therefore, Deputy Warden Orr should be dismissed as a defendant in this lawsuit. As Mr. Lane points out, however, the PLRA imposes no requirement on an inmate to name every possible defendant. Rather, the statute merely requires the inmate to provide enough information to provide prison officials "time and opportunity to

address complaints internally before allowing the initiation of a federal case." Woodford v. Ngo, 548 U.S. 81, 93 (2006).

"Section 1997e(a) requires a prisoner to exhaust all 'available' administrative remedies, and implicit in that requirement is an obligation on the prisoner to provide those officials who will pass upon the grievance all the relevant information that he has, including the identity of any officials he thinks have wronged him." Brown v. Sikes, 212 F.3d 1205, 1207-08 (11th Cir. 2000). However, the exhaustion requirement is designed "to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued . . . ." Jones v. Bock, 549 U.S. 199, 219 (2007). Therefore, a "prisoner need not name a particular defendant in a grievance in order to properly exhaust his claim." Parzyck v. Prison Health Servs., Inc., 627 F.3d 1215, 1218 (11th Cir. 2010) (citing Jones, 549 U.S. at 219); see also Brown, 212 F.3d at 1207 ("we conclude that while § 1997e(a) requires that a prisoner provide as much relevant information as he reasonably can in the administrative grievance process, it does not require that he do more than that"). "[E]xhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances." Jones, 549 U.S. at 219.

While Mr. Lane's grievances did not specifically name Deputy Warden Orr, the PLRA did not require that he do so. Mr. Lane accomplished the purpose of § 1997e(a) by alerting prison officials that VSP administrators failed to protect his

10

constitutional rights. His grievance notified VSP officials to a problem he wished to have addressed and provided those same officials with the opportunity to internally investigate his complaint, which is all that is required. More specifically, Mr. Lane's grievance accuses VSP administrative officials of violating his constitutional rights for failing to house him in a safe environment. (Doc. 69-6, p. 15). At the time of the attack, Deputy Warden Orr was the Deputy Warden of Security at VSP. It is therefore reasonable to assume that even though Mr. Lane did not specifically name Deputy Warden Orr, he intended his complaint to encompass all officials who had authority to make security related decisions. Defendants' motion to dismiss Deputy Warden Orr based on exhaustion is accordingly **DENIED**.

### 2. Claims against remaining Defendants

In moving to dismiss Mr. Lane's claims against the remaining Defendants on exhaustion grounds, Defendants seek to impose a pleading standard on the administrative grievance process that simply does not exist. "Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.'" Jones, 549 U.S. at 218. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Id.

Defendants have pointed to no provision in the Department of Corrections Standard Operating Procedures that imposes any specificity requirement. In the absence of such a provision, the Court concludes that Mr. Lane satisfactorily complied with the prison's grievance process by filling out the forms provided to him. As Mr. Lane observes, the forms themselves provide an inmate with very little opportunity to include significant detail regarding his claims. However, in the limited space provided, Mr. Lane articulated that he previously requested and was denied a transfer; that prison officials failed to investigate gang activity; that as a result he was assaulted; and that the inaction of prison administrators amounted to a violation of his constitutional rights. The Court finds that this information, although limited, was enough to alert prison officials to the problem and to afford them the opportunity to investigate. That is all that is required. Defendants' motion to dismiss the remaining Defendants on exhaustion grounds is therefore **DENIED**.

### C. Failure to Protect Claim

Under the Eighth Amendment, prison officials have a duty to "take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). Mainly, they "have a duty to protect prisoners from violence at the hands of other prisoners." Id. (quoting Farmer, 511 U.S. at 833) (internal quotation marks omitted). Not every injury that one inmate

suffers at the hands of another inmate gives rise to constitutional liability. <u>Farmer</u>, 511 U.S. at 834. A prison official only violates the Eighth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." <u>Id.</u> (quoting <u>Carter v. Galloway</u>, 352 F.3d 1346, 1349 (11th Cir.2003)) (internal quotation marks omitted). To plead a failure to protect claim under the Eighth Amendment, a plaintiff must allege facts that show "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1331 (11th Cir. 2013) (internal quotation marks omitted).

### 1.    Substantial Risk of Serious Harm

The first element of an Eighth Amendment claim – substantial risk of serious harm – is viewed objectively. <u>Caldwell</u>, 748 F.3d at 1099. To establish a substantial risk of serious harm, failure to protect plaintiffs are "not required to show . . . precisely who would attack whom . . . but only that [the defendants] had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence." <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579, 1583 (11th Cir. 1995) (internal quotations omitted). The Eleventh Circuit has stated that "an excessive risk of inmate-on-inmate violence at jail creates a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, but confinement in a prison where

violence and terror reign is actionable." <u>Harrison v. Culliver</u>, 746 F.3d 1288, 1299 (11th Cir. 2014).

In reversing this Court's dismissal of Mr. Lane's *pro se* complaint, the Eleventh Circuit found that Mr. Lane's original complaint "sufficiently set out a substantial risk of serious harm." <u>Lane v. Philbin</u>, 835 F.3d 1302, 1308 (11th Cir. 2016). The appellate court found that while any one of Mr. Lane's allegations standing alone may not rise to the level of a constitutional violation, the totality of the circumstances described by Mr. Lane "taken together, permit a reasonable inference that E-Building was a place with inadequate supervision of dangerous inmates who possessed weapons, and where violence and terror were the norm." <u>Id.</u> at 1308 (citing <u>Gates v. Collier</u>, 501, F.2d 1291, 1309 (5th Cir. 1974) ("Each factor separately . . . may not rise to constitutional dimensions; however, the effect of the totality of the circumstances is the infliction of punishment on inmates violative of the Eighth Amendment, as determined by the trial court.").

The Court agrees with Defendant that the Eleventh Circuit's holding that Mr. Lane's *pro se* complaint satisfied the first element of an Eighth Amendment claim is not dispositive. In remanding the case, the Eleventh Circuit instructed the Court to permit Mr. Lane to file an amended complaint. As a general principal, an amended complaint supersedes the initial pleading. <u>Lowery v. Ala. Power Co.</u>, 483 F.3d 1184, 1219 (11th Cir. 2007). Therefore, in evaluating the present motion to dismiss, the Court must consider the factual allegations set forth in Mr.

Lane's amended complaint, which varies from the *pro se* complaint reviewed by the Eleventh Circuit. Nevertheless, the Court still must be guided by the Eleventh Circuit's analysis.

In order to satisfy the substantial risk of serious harm element of an Eighth Amendment claim at the pleading stage, Mr. Lane "had to allege conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." Lane, 835 F.3d at 1307 (citing Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). The allegations in Mr. Lane's amended complaint sufficiently meet this requirement.

Defendants suggest that Mr. Lane's allegations relating to the threat of violence in E-Building are, at best, conclusory and must be disregarded by the Court. Conclusory allegations are those that amount to nothing more than mere "labels or conclusions or a formulaic recitation of the elements of a cause of action." Iqbal, 556 U.S. at 678 (internal quotation marks and citation omitted); see also Franklin v. Curry, 738 F.3d 1246, 1250 (11th Cir. 2013) ("Conclusory allegations fail to apprise defendants of the factual basis of the plaintiff's claims."). A plaintiff cannot rely on "naked assertions devoid of further factual enhancement." Id. (internal quotation marks and alteration omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. Conclusory statements include bald allegations that a defendant was deliberately indifferent or that he knew or should have

known of a risk, allegations which, without more, carry no weight. <u>See</u> <u>Franklin</u>, 738 F.3d at 1251.

While Mr. Lane's complaint does include some conclusory allegations to help frame his claims, his complaint still contains enough factual allegations, accepted as true, to establish a substantial risk of serious harm. Mr. Lane alleges that E-Building, which is comprised of two 50-person dorms, is secured by a single guard. (Doc. 68, ¶¶ 17, 69). E-Building is known by both the inmates and VSP staff as "gangland" because the vast majority of the inmates housed in the dormitory are known to be members of gangs. (<u>Id.</u> at ¶¶ 18-19). Of the 100 inmates in E-Building, only about six, including Mr. Lane, are not affiliated with a gang. (<u>Id.</u> at ¶¶ 20-21). As a result of inadequate supervision in E-Building, inmate-on-inmate violence is a frequent occurrence, with an incident happening at least once every other week. (<u>Id.</u> at ¶¶ 24, 32). The violent conditions are exacerbated further by the prevalence of weapons, possession of which is tolerated and even encouraged by prison officials. (<u>Id.</u> at ¶¶ 35-37). Inmates have ready access to weapons, procuring scrap metal and removing light fixtures and parts from locker boxes to fashion shanks. (<u>Id.</u> at ¶¶ 38-40).

Based on these allegations, the Court finds that Mr. Lane has satisfactorily set forth the substantial risk of serious harm element of an Eighth Amendment claim. He has described n setting where inadequate supervision and ready access to weapons created an environment where "violence and terror reign."

Harrison v. Culliver, 746 F.3d at 1299; see also Marsh v. Butler, Cty., Ala., 268 F.3d 1014, 1027-28 (11th Cir. 2001) (en banc) (holding that a plaintiff satisfied the substantial risk of serious harm element by alleging that inmates had ready access to weapons, dismantled the jail facility to make weapons, and were inadequately supervised by prison officials); Williams v. Edwards, 547 F.2d 1206, 1211 (5th Cir. 1997) (finding that easy access to materials that can be fashioned into weapons contributed to a substantial risk of serious harm).

### 2. Deliberate Indifference

Satisfaction of the second element of an Eighth Amendment claim – the defendant's deliberate indifference to a substantial risk of serious harm – requires three components: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott v. Foley, F.3d 1248, 1254 (11th Cir. 1999). The defendant must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; Caldwell, 748 F.3d at 1099-1100.

"[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842. However, "before [a defendant's] awareness arises to a sufficient level of culpability, there must be

much more than mere awareness of [an inmate's] generally problematic nature." Carter, 352 F.3d at 1349. The plaintiff must allege facts that the official possessed knowledge of the condition and of the means to cure the condition "'so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.'" LaMarca v. Turner, 995 F.2d 1526, 1536 (11th Cir. 1993) (quoting Duckworth v. Franzen, 780 F.2d 645, 653 (7th Cir. 1985)). "Thus, if an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he cannot be deliberately indifferent unless he knows of, but disregards, an appropriate and sufficient alternative." Id.

The factual allegations in Mr. Lane's complaint establish the plausibility that each of the Defendants was subjectively aware of the substantial risk of serious harm Mr. Lane faced as a result of being a non-gang member housed in a dormitory comprised predominately of gang members and where possession of weapons was rampant and unmoderated by prison officials. He alleges generally that VSP administrators, which includes the four individuals named in his complaint, regularly referred to E-Building as "gangland" and were aware of the armed violence within that particular dorm. (Doc. 68, ¶¶ 19, 51). He further alleges that Defendants, knowing of the dangerous conditions in E-Building, used the threat of transfer to E-Building to control inmates housed in other parts of the prison. (Id. at ¶ 51).

Mr. Lane alleges that on at least two occasions prior to the attack, he addressed his concerns about the conditions in E-Building with Counselor Woods, informing her of the violence within the dormitory and the threats he received. (Id. at ¶ 55). Mr. Lane requested that Counselor Woods transfer him to another housing unit. (Id. at ¶ 55). Based on these allegations, coupled with the general allegations of what knowledge prison officials had about the conditions in E-Building, a plausible inference may be drawn that Counselor Woods was subjectively aware of the substantial risk of harm faced by Mr. Lane.

More than a month prior to the attack, Mr. Lane also addressed his fear for his safety as a result of the violence in E-Building with Deputy Warden Philbin. (Id. at ¶ 61-62). He alleges that in response to his request for a transfer, Deputy Philbin told Mr. Lane to sue him. (Id. at ¶ 63). As the Deputy Warden of Care and Treatment at VSP, Deputy Warden Philbin was aware of the minimal staffing requirements of E-Building and also knew that at the time of the June 2012 incident there was only one floor guard supervising all 100 inmates in E-Building. (Id. at ¶¶ 67, 70). These allegations permit a plausible inference that Deputy Warden Philbin was aware of the dangerous conditions in E-Building and that Mr. Lane requested a transfer because of those conditions.

Mr. Lane has also set forth sufficient allegations to plausibly show that Defendants Captain Maine and Deputy Warden Orr were subjectively aware of the substantial risk of serious harm encountered by Mr. Lane in E-Building. Each

19

of these individuals served in a capacity that involved ensuring the safety of the inmates and the security of the prison. (Id. at ¶¶ 6, 8-9, 41). Captain Maine, the Captain of Security at VSP, was responsible for conducting monthly searches of the dormitories for weapons and other contraband. (Id. at ¶¶ 9, 42). Even though Captain Maine had the authority to confiscate any weapons recovered during these "shakedowns," as a general practice he did not. (Id. at ¶¶ 43-45). He even was known to redistribute weapons to select inmates. (Id. at ¶ 46). Mr. Lane additionally alleges that Captain Maine cooperated with the gang members in E-Building, providing materials that could be used to fashion weapons and smuggling in contraband like tobacco and cell phones to appease gang members who threatened violence in E-Building. (Id. at ¶¶ 47-50). Mr. Lane states that he overheard Captain Maine threaten other inmates with transfer to E-Building if they did not comply with his orders. (Id. at ¶ 53). Even though Mr. Lane never communicated a particularized threat to Captain Maine, Mr. Lane has pled sufficient other allegations to establish that Captain Maine was subjectively aware of the substantial risk of harm associated with being housed in E-Building.

Like Captain Maine, Deputy Warden Orr also was known to threaten to transfer unruly inmates in other dorms with transfer to E-Building. (Id. at ¶ 52). As the Warden of Security, Deputy Warden Orr knew that there was no security detail for inmates moving from E-Building across the flat top to the dining hall. (Id. at ¶ 78). Mr. Lane complained to Deputy Warden Orr about the prevalence of

weapons in E-Building. (<u>Id.</u> at ¶ 54). In response, Deputy Warden Orr stated, "I know about the knives, it's out of my hands. I know they make them. It's the state's problem, ain't nothing I can do." (<u>Id.</u>). This statement alone is enough to establish Deputy Orr's subjective knowledge of the threat of harm in E-Building.

The Court is satisfied that Mr. Lane has also set forth sufficient factual allegations to establish that Defendants unreasonably responded to the risk of serious harm posed to Mr. Lane in E-Building. Beyond the most straightforward means of addressing the risk of harm Mr. Lane faced in E-Building as a non-gang member – transfer to another dormitory – Mr. Lane also points to deficiencies in staffing E-Building, noting that even though the prison required one floor guard in each section of E-Building, during the relevant time period, only one guard supervised all 100 inmates. (<u>Id.</u> at ¶¶ 67, 69). Deputy Warden Philbin, Deputy Warden Orr, and Captain Maine all had the authority to address guard staffing in E-Building and knew that E-Building was staffed with a single guard; yet they took no measures to address this safety issue. (<u>Id.</u> at ¶¶ 70-75). These same Defendants were also aware of the risks posed to inmates along the flat top between E-Building and the dining hall but did not provide a guard to escort inmates. (<u>Id.</u> at ¶¶ 76-80, 81-83).[3] Mr. Lane contends that even if additional

---

[3] Defendants attempt to draw a distinction between Mr. Lane's allegations of violence within E-Building and outside on the flat top, implying that Mr. Lane has not alleged that he informed prison officials that he feared for his safety on the flat top. However, it is implicit from Mr. Lane's complaint that what he alleges is

staffing was not available, at the very least, Defendants could have restricted the number of inmates moving through the outdoor area at one time. (Id. at ¶ 83).

In addition to the staffing issues, Mr. Lane alleges that Defendants could have taken a number of other steps to ensure the safety of the inmates in E-Building. These measures include legitimately sweeping the dorm for weapons and ensuring that any weapons or materials that could be fashioned into weapons were removed.

Defendants contend that Mr. Lane has not established that Defendants could have abated the risk he faced by transferring him to another dorm because Mr. Lane has not alleged that transfer was an available option. Defendants ask the Court to infer from Counselor Woods' statement that she could not personally transfer Mr. Lane and from another comment that "[e]verybody is trying to get out of E-Building" that transfer was not an available option. While the facts may ultimately demonstrate that transferring Mr. Lane either was not an available remedy or otherwise would not have lessened the risk he faced, at this stage of the litigation, the allegation that he requested the transfer for safety reasons and that the transfer was denied despite knowledge of the risk posed to Mr. Lane if he remained in E-Building will suffice.

---

that violence was prevalent among the E-Building inmates and that the violence was not contained within the four walls of the dormitory. Thus, the risk he faced extended to the flat top when the inmates moved together from one location to another.

### 3. Causation

The final element – causation – "requires proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional violation." LeMarca, 995 F.2d at 1538 (internal quotation marks and citation omitted). The "critical" question is whether the defendant was "in a position to take steps that could have averted the . . . incident . . . but, through [deliberate] indifference, failed to do so." Williams v. Bennett, 689 F.2d 1370, 1384 (11th Cir. 1982). A plaintiff demonstrates the necessary causal link by showing that the prison official "(1) had the means to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded." Rodriguez v. Sec'y for the Dep't of Corr., 508 F.3d 611, 622 (11th Cir. 2007) (internal alterations and citation omitted).

While discovery may ultimately produce facts that prove otherwise, the Court at this stage concludes that Mr. Lane has pled sufficient facts to establish causation. Mr. Lane has adequately set forth enough factual detail that each Defendant had the means to impact the conditions to which he was subject; that each Defendant knew that the actions he or she took in response to Mr. Lane's safety concerns was insufficient to shield him from violence; and that each Defendant had the means available to take some action yet did nothing.

### D.    Qualified Immunity

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citation omitted). The purpose of qualified immunity "is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Id. Here, there is no dispute that Defendants were acting within the scope of their discretionary authority at the time of the alleged incident.

Once the defendant establishes that he was acting in a discretionary capacity, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. The court must apply a two-step analysis to determine whether or not the defendant is entitled to qualified immunity. The first inquiry asks whether, when taken in a light most favorable to the plaintiff, the facts demonstrate that the officer's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). "If a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine

24

'whether the right was clearly established'" at the time of the alleged violation. Lee, 284 F.3d at 1194 (quoting Saucier, 533 U.S. at 201). "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

Under the version of the facts set forth in Mr. Lane's complaint, he has established a constitutional violation. The Court now must consider whether the law was clearly established. Defendants argue that the law was not clearly established that a prison official would violate a prisoner's Eighth Amendment rights by failing to transfer him when there is no specific or general threat posed to the inmate and when there are only vague or conclusory allegations of weapons in the dorms without evidence of pervasive violent conditions.

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). A plaintiff can demonstrate that a constitutional violation was clearly established in one of two ways. Id. at 1255. First, a plaintiff "may show that 'a materially similar case has already been decided.'" Id. (quoting Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005)). Second, a plaintiff "can point to a 'broader, clearly established principle [that] should control the novel facts [of the] situation.'" Id. (quoting Mercado, 407

F.3d at 1159); accord United States v. Lanier, 520 U.S. 259, 271 (1997) ("[G]eneral statements of the law are not inherently capable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.") (internal punctuation and citation omitted).

Mr. Lane's complaint alleges that Defendants failed to transfer him after he notified prison officials that he was being threatened by other inmates in E-Building; that there was widespread violence and possession of weapons among the inmates in E-Building; and that he feared for his safety. (Doc. 68, ¶¶ 54-55, 60-61). However, his complaint goes further than to complain about the general conditions and his desire to be relocated to another dormitory. Mr. Lane additionally sets forth allegations that prison officials were aware of the disparity between gang and non-gang affiliated inmates housed in E-Building and, rather than implementing measures to protect inmates like Mr. Lane who were not associated with a gang, prison officials facilitated the creation of dangerous conditions by not properly staffing a dormitory where inmate-on-inmate violence occurred on at least a bi-weekly basis and by tolerating, and even encouraging and enabling, the possession of contraband weapons. (Id. at ¶¶ 19-22, 24, 32, 35-37).

In 2012, when the attack on Mr. Lane occurred, no reasonable officer reasonably could have believed that doing nothing in the circumstances described in Mr. Lane's complaint was constitutional. While neither the Court nor the parties have identified a case that is exactly on point with the factual scenario presented in this case, the general principal is well established that prison officials have a duty to protect inmates from a substantial risk of violence and that they violate a prisoner's Eighth Amendment rights by failing to engage in any way to reduce that risk. In Farmer v. Brennan, the Supreme Court made clear that prison officials have a duty "to protect prisoners from violence at the hand of other prisoners," and that an official may be liable if he knows of and disregards a substantial risk of an inmate-on-inmate attack "by failing to take reasonable measures to abate [the risk]." 51 U.S. at 847. Clear Eleventh Circuit precedent also establishes that it is an unreasonable response for prison officials to do nothing to address prison conditions that pose a serious risk of physical harm to inmates. See Marsh v. Butler Cty., Ala., 268 F.3d 1014, 1034 (11th Cir. 2001) (en banc) ("[A]t the time of the assaults in this case, it was clearly established in this Circuit that it is an unreasonable response for an official to do nothing when confronted with prison conditions – like the conditions alleged in this case – that pose a risk of serious physical harm to inmates."). Accordingly, at this stage, Defendants are not entitled to qualified immunity.

### III.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss (Doc. 69) Plaintiff's Third Amended Complaint. The Court hereby lifts the stay of this case and will issue a new Rules 16 and 26 Order.

**SO ORDERED** this 22nd day of September, 2017.


*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

aks